Filed 3/28/16  P. v. McDaniels CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LYNETTE McDANIELS,<br><br>    Defendant and Appellant. | H041476<br>(Santa Clara County<br>Super. Ct. No. C1478201) |

Defendant Lynette McDaniels was convicted after a jury trial of six counts of second degree robbery (Pen. Code, §§ 211, 212.5).[1]  The jury also found true four allegations that she had personally used a firearm.  (§ 12022.53, subd. (b).)  She was sentenced to an aggregate term of 27 years in prison.  On appeal, defendant argues that her convictions must be reversed, because the trial court abused its discretion when it refused to allow her sister to testify on certain subjects, including defendant's habit of cashing her paychecks.  Defendant also argues that defense counsel rendered ineffective assistance by failing to request a final ruling on the admissibility of DNA evidence that purportedly showed that her DNA was not found on bait money that was touched during one of the robberies.  She also claims that if the issue is cognizable on direct appeal, the exclusion of the DNA evidence was erroneous and prejudicial.

We affirm the judgment.  Even though the trial court erred when it refused to allow certain testimony, the error was not prejudicial.  Additionally, defendant does not

---

[1] Unspecified statutory references are to the Penal Code.

demonstrate that defense counsel rendered ineffective assistance.  Based on the record before us, it is possible that defense counsel had a rational, tactical reason for her conduct.

BACKGROUND

**A.      The Information**

On May 27, 2014, defendant was charged by a first amended information with six counts of second degree robbery (§§ 211, 212.5, subd. (c)).  It was alleged as to four of the counts that she personally used a handgun during the commission of the offense (§ 12022.53, subd. (b)).  Defendant pleaded not guilty to all of the charges and denied the allegations.  Presentation of evidence in her jury trial commenced on June 10, 2014.

**B.      The Evidence at Trial**

1. *Count 1*:  *November 9, 2013 Robbery*

On November 9, 2013, Julisa Robinson was working as a teller at a Wells Fargo branch located at 139 McCarthy Ranch in Milpitas.  Conrad Tran was working at the counter next to Robinson.  That day, Robinson noticed the suspect walking unusually fast towards her counter.[2]  The suspect was wearing a wig and sunglasses.  Robinson was not sure if the suspect was a man or a woman, but initially thought she was a man wearing a wig.  When the suspect got closer, Robinson noticed acne scars on her cheeks and part of her forehead.  Robinson thought the suspect was approximately five feet four inches or five feet five inches tall, twenty-something years old, and 140 to 150 pounds.

The suspect told Robinson that she wanted to make a deposit, took out a note, and placed the note on the counter.  Robinson read the note and noticed that it contained the words "no bait."[3]  After seeing the note, Robinson became afraid.  The suspect told her,

---

[2] Robinson said she was not sure if the suspect was a man or a woman.  However, for consistency we will refer to the suspect as "she."

[3] Bait money is money that has a tracking device.

"This is a robbery. We're professionals. Give us the money." Robinson took money out of her drawers and placed them on the counter. The suspect took the money and left.

Robinson said that she remained unsure about the suspect's gender even after the suspect spoke. Robinson admitted that once she became afraid, she purposefully looked away from the suspect. She was only face-to-face with the suspect for a few seconds before she saw the note.

### 2. *Count 2*: *November 23, 2013 Robbery*

On November 23, 2013, Radha Sripathy was working as a teller at a Wells Fargo branch located on 1705 North First Street in San Jose. That morning, Sripathy called the suspect over to her counter. The suspect was wearing a long, very curly black wig, large sunglasses, and a long-sleeved shirt. Sripathy thought that the suspect was twenty-something years old, African American, maybe five feet or five feet one inch tall, and approximately 110 to 120 pounds. Sripathy thought the suspect was a woman. She may have had acne or scars on her cheeks.

The suspect approached Sripathy's counter, placed a note down, and told Sripathy, "I want all your money." The suspect repeated this statement several times. Sripathy gave the suspect money from the drawers. When Sripathy told the suspect that there was no money left to give, the suspect responded, "No. Give me all your money. See what I have in my hand. See what I have in my hand." Based on these statements, Sripathy thought that the suspect had a weapon, but she did not see a gun. Sripathy put more money on the counter. The suspect took the money and put it in her bag.

### 3. *Count 3*: *December 11, 2013 Robbery*

On December 11, 2013, Rebecca Lopez was working as a teller at a Bank of America branch located on 1245 Lincoln Avenue in San Jose. That afternoon, the suspect approached Lopez's teller counter. Lopez recalled that the suspect was female, African American, and was wearing a wig and sunglasses. Lopez said that the suspect

3

had moles on the sides of her cheeks and was approximately five feet three inches or five feet four inches tall. The suspect was wearing long sleeves and was carrying a beige and black handbag. The suspect placed a note on Lopez's counter that said that this was a robbery. At first, Lopez thought that the suspect was joking, so she smiled. The suspect looked at Lopez and told her that she was "not playing," and to "give me all your hundreds."

Lopez became worried and began looking around the room for her manager. Lopez looked towards the suspect and saw that the suspect was holding a black gun. Lopez gave the suspect money, including bait money. The suspect placed the money in her purse.

After the robbery, Lopez was interviewed by the police. She told the police that the suspect was wearing black clothing. However, surveillance footage showed that the suspect was actually wearing a pink sweater. Also, Lopez had initially told investigators that the suspect's purse was beige and black, with the letters "L" and "C." Surveillance footage showed that the purse was entirely black.

4. *Count 4*: *December 30, 2013 Robbery*

On December 30, 2013, Kelly Dinh was working as a service manager at a Wells Fargo branch located on 1715 Landess Avenue in Milpitas. Dinh saw the suspect inside the branch and described her as an African American female wearing a dark-colored wig and a light-colored long-sleeved shirt. Dinh approximated that the individual was five feet or five feet three inches tall and 40 years old. Dinh said the suspect had acne scars on her face and was wearing sunglasses.

At the time, Dinh was behind the teller counters. She began walking towards another teller, David Young. As she got closer, she saw that the suspect was pointing a black or dark gray gun at Young and was demanding money.

4

At trial, Young testified that the suspect had handed him a note that read, "Give me $20,000 or I will shoot." Young said the suspect was holding a black semiautomatic handgun. Young gave the suspect all the money in his top drawer. He then told her that he did not have any more money. The suspect told Young to give her the money in the bottom drawer. At some point, the suspect pulled the slide of the gun back and pointed the gun at Young. Young gave her more money from another drawer.

5. *Count 5*: *January 6, 2014 Robbery*

On January 6, 2014, Ashton O'Campo was working as a teller at a Comerica Bank branch located on 1289 South Park Victoria Drive in Milpitas. O'Campo described the suspect as female, African American, approximately five feet two inches tall, 125 pounds, and approximately twenty-something years old. The suspect had a wrap around her hair and was wearing sunglasses that covered the majority of her face. O'Campo noticed that she had acne on her forehead.

The suspect told O'Campo that she wanted to cash a check. She then pulled out a note that had the words "money" and "gun." After seeing the note, O'Campo began placing money on the counter. He saw that the suspect was pointing a gray or silver gun towards him. The suspect took the money from the counter and placed the money in her purse.

Another teller, Sanna Zubair, was working next to O'Campo that day. Zubair saw the suspect come in, and described her as young and African American. The suspect was wearing a head wrap around her hair.

6. *Count 6*: *February 8, 2014 Robbery*

On February 8, 2014, Mahtab Kakoui was working as a teller at a Wells Fargo branch located on 4888 San Felipe Road in San Jose. The suspect entered the bank and approached Kakoui's counter. Kakoui recalled that the suspect was wearing long sleeves and a long black wig. Kakoui said that nothing else covered the suspect's face.

5

Kakoui described the suspect as young, approximately 21 or 22 years old, and approximately five feet five inches or five feet six inches tall and between 125 to 130 pounds.

Kakoui said that the suspect said that she wanted to cash a check. Kakoui looked away and prepared for the transaction. When Kakoui looked back at the suspect she was holding a black and grey gun. Kakoui said that she gave the suspect bait money. She did not actually see the suspect touch the money, because she had turned away to gather more money from her drawers. When she turned back, the bait money was gone and Kakoui presumed that the suspect had placed the money in her purse.

### 7. *Identification of Defendant as the Suspect*

Tran had been working as a teller in the bank during the first robbery. He testified that when he first saw the suspect walk into the bank, he thought that he had seen her before. He did not initially tell the police about his suspicions. About a month to a month and a half after the robbery, Tran looked through several of his school yearbooks. While going through his middle school yearbook, Tran saw defendant's photo. Tran said that his "gut" told him that defendant was the one who had robbed his bank branch. He remembered seeing defendant in eighth grade, but he could not recall if he had any classes with her. Tran was 22 years old at the time of the trial.

Before going to the police with this information, Tran attempted to find more pictures of defendant through her social media accounts. Tran found defendant's profile on Facebook. Tran also found defendant's Instagram page, which had some photos, including a photo of handguns.

Tran explained that Wells Fargo had an internal Web site where photos of robbery suspects are posted. He had seen photos of the suspect that had robbed the other banks, and he believed that the photos depicted the same person who had robbed his bank

6

branch. Tran decided he needed to contact the police with this information. He sent San Jose Police Department Detective Rafael Varela the photos he had found.

Detective Varela viewed the surveillance videos of the six robberies and concluded that the same individual perpetrated all of the crimes. He also thought the suspect in all six of the robberies had the same modus operandi. Varela prepared a six-person photo lineup that included defendant's photograph.

Detective Varela had another police officer, Detective Elizabeth Ornelas, who had no knowledge of the case, show Kakoui the photos on March 6, 2014. The first time she looked through the photos, Kakoui told officers that she did not recognize any of the individuals. The second time she viewed the photos, Kakoui picked defendant's photo. At the time of the identification, Kakoui said that she was "50 percent sure" of her identification and referred to defendant's photo as a "he." Ornelas forgot to have Kakoui sign defendant's photo, so she showed Kakoui the photo lineup a third time. This third time, Kakoui again said that defendant looked similar to the robber.

Detective Varela gave defendant's name to the Milpitas Police Department, and Detective Chris Salazar prepared his own photo lineup that included defendant's photo. Other Milpitas officers conducted photo lineups with the witnesses.

On March 12, 2014, Milpitas Police Department Detective Alex Prince, who was not involved in the case, contacted Robinson and showed her the photo lineup. Robinson picked defendant's photo. Robinson said she picked defendant's photo because defendant had "similar features, the face structure and everything" to the suspect who had robbed the bank. Robinson said that she did not speak to her coworker, Tran, about the photo lineup. Tran also identified defendant from the photo lineup.

The same day, Detective Prince showed the photo lineup to Dinh. Dinh picked out defendant's photo. She said she was not completely sure of her identification, but defendant had similar features to the robber.

7

Detective Prince also showed O'Campo the photo lineup. Initially, O'Campo picked out two photos from the lineup. He then picked out defendant's photo based on the shape of the face. O'Campo said that he was not entirely sure if defendant was the one who committed the robbery.

Detective Salazar, who knew that defendant was the suspect, was present in the room when Detective Prince administered the photo lineup to Robinson, Tran, Dinh, and O'Campo. Salazar said that he was "standing away from the desk" when Prince showed the witnesses the photos.

On March 13, 2014, Milpitas Police Detective Matthew Miller showed Zubair the photo lineup. Zubair picked out defendant's photo. At the time, Zubair said that defendant's photo looked similar to the robber, but she would be more sure if defendant was wearing sunglasses and a wrap around her hair like the suspect who had robbed the bank.

During the trial, the employees at the bank, including Robinson, Sripathy, Lopez, Young, Dinh, O'Campo, Zubair, and Kakoui identified defendant as the suspect who robbed the banks. Surveillance videos of the robberies were played for the jury.

8. *Search of Defendant's Home, Car, and Cell Phone*

After obtaining a warrant, San Jose Police Department Detective Brian Meeker searched defendant's car and found several items of clothing, including a white flannel top and several cell phones. He also found a white thermal top in defendant's car, which he believed was consistent with clothing that had been worn during one of the robberies.

Detective Meeker also conducted a search of defendant's home, looking for clothing, weapons, or any indicia that she was linked to the robberies. There were multiple bedrooms in the home, and Meeker was able to determine which one belonged to defendant. He found a nine millimeter cartridge in defendant's bedroom and a pink sweater close to a stairwell in the house. The sweater appeared to be consistent with the

8

pink sweater worn during one of the robberies. He found a pair of shoes that he believed was consistent with a pair worn during one of the robberies.

Officers were not able to find any firearms or wigs. Meeker explained that the house was in "complete disarray," and there was "clothing everywhere . . . arts and crafts, things stacked two to three feet high inside every bedroom other than [defendant's] bedroom." Defendant lived with her sister and her sister's infant child. Meeker said that in order to conduct a search of the entire home, he would have had to unload the entire contents of the house onto the front yard. Meeker decided against doing so.

Investigators downloaded images from defendant's cell phone after defendant voluntarily unlocked her phone. The images included: (1) a photo of defendant wearing a hat on December 14, 2013, (2) a photo of a handgun and a magazine taken on January 1, 2014, (3) a photo of defendant holding a handgun and pointing at a mirror taken on December 31, 2013, (4) a photo of defendant holding a handgun with her finger on the trigger taken on January 1, 2014, (5) a photo of cash taken on December 14, 2013, and (6) a photo of a handgun magazine with at least two 9-millimeter rounds inside the magazine taken on January 1, 2014, and (7) a photo of defendant's niece holding a substantial amount of cash taken on January 5, 2014.

Detective Meeker examined the photos and made some observations. He stated that the handgun depicted in the photos was a real gun. And, the magazine in the photo was a real magazine. Meeker examined stills from the surveillance videos taken from the robberies and concluded that the guns in defendant's cell phone photos were consistent with the ones used in the robberies.

9

9. *The Defense's Case*

Defendant's sister, Charnele McDaniels, lived with defendant and was present when the police searched the home.[4] One of the pink sweaters the officers had seized belonged to her, not to defendant. Charnele said that she did not share clothes with her sister. However, Charnele did not lock her clothes away when she was not wearing them. Charnele said that her sister had purchased three used cars in the past year, including a Mercedes. None of the cars had been new, including the Mercedes. Defendant did not own all three cars at the same time.

Charnele was shown the photo taken from defendant's cell phone depicting her daughter (defendant's niece) with a large sum of cash. Charnele identified her daughter as the girl in the picture and confirmed that she did not give her daughter the cash in the photograph.

Defendant's coworker, Clarence Harlin, said that the thermal top seized by police when they searched defendant's car belonged to him. Harlin said that he left the top in defendant's car after defendant gave him a ride to work one day. After her arrest, Harlin said that defendant called him almost every day. Harlin testified that defendant told him that the police had nothing on her and that investigators had the wrong person in custody.

Defense expert witness, Dr. Kathy Pezdek, testified as an expert in memory and how memory relates to eyewitness identifications. Dr. Pezdek explained that the more times a witness has to look at the face of a perpetrator, the more reliable their identification is. However, Dr. Pezdek noted that when a weapon is used during a crime, witnesses may focus less on the suspect and more on the weapon. The presence of a weapon can also elevate stress, which can impair reliability. Items that cover an individual's face, such as sunglasses and baseball caps, can also lower the accuracy of a

---

[4] Since defendant and her sister share the same surname, we refer to Charnele by her first name.

10

witness's identification. The length of time between identification and when the witness saw the person can impact reliability. The shorter the time between identification and exposure, the more reliable the identification is.

Dr. Pezdek also testified that numerous studies have shown that people are more likely to accurately identify people of their own race or ethnicity compared with people of a different race or ethnicity. Dr. Pezdek asserted that when a witness has a limited amount of exposure time to an individual, "cross-race face recognition suffers more than same-race face recognition."

Additionally, Dr. Pezdek explained that post-event information, such as viewing a photograph, can affect a witness's memory. "[I]f the post-event information was biased in people to perceive a particular person, then over time, it's likely that that's what their memory is going to confirm to. That post-event information is going to suggestively influence their memory to the person they saw." Post-event information can falsely increase a witness's confidence in his or her identification. However, a witness's confidence in his or her identification is not a predictor of accuracy.

Dr. Pezdek commented that photo lineups are proper, and that police procedures for administering lineups are generally good. Lineups should be administered by officers who do not know who the suspect is. Officers who know which photo depicts the suspect may have difficulty refraining from giving nonverbal cues that can impact a witness's choice. Dr. Pezdek opined that in-court identifications should not be used, because there is only one option presented to the witness and the process is highly suggestive.

C.      **The Verdict and Sentencing**

On June 17, 2014, the jury found defendant guilty of all six counts of robbery. The jury also found true the four allegations that defendant had personally used a firearm.

11

On August 25, 2014, defendant was sentenced to an aggregate term of 27 years in prison. She was awarded 193 days of credit for time already served. The court ordered defendant to pay victim restitution. Defendant appealed.

## DISCUSSION

On appeal, defendant argues that the trial court abused its discretion when it refused to allow her sister to testify on certain subjects, such as defendant's spending habits. Defendant claims that this evidence tended to show that the cash depicted in some of her cell phone photos came from a legitimate source. Defendant also argues that defense counsel rendered ineffective assistance when she failed to press for a final ruling on whether certain DNA evidence should be admitted. According to defense counsel, a laboratory report showed that male DNA was found on bait money that was touched during one of the robberies. Additionally, the laboratory report indicated that defendant's DNA had been excluded as contributing to the DNA mixture found on the bait money.

1. *Exclusion of Sister's Testimony*

   a. **Background**

During trial, defendant moved to admit testimony from her sister Charnele that defendant often cashed her paychecks, stored the money in the house, did not have to pay rent, and saved whatever money she had. Defendant also wanted to admit Charnele's testimony that defendant did not go out shopping, did not change her spending habits in the past year, and did not own expensive things.

Defendant argued that this evidence was relevant and admissible, because the People had introduced photos of defendant and defendant's niece that depicted large sums of cash. Defendant argued that Charnele's testimony tended to show that there was an innocent explanation for the cash shown in the photos.

The trial court disagreed, ruling the testimony inadmissible because it was purely speculative. The court noted that it would be "one thing" if the prosecution had argued

12

that "the only possible explanation for the photograph . . . [is that] it's the money from the robberies." However, the court remarked that the People had indicated that they were only going to argue that the photos of cash were consistent with the timing of the robberies. Therefore, "that [defendant] is employed and how much she makes doesn't in any way detract from that evidence unless there is going to be evidence, direct evidence, that that money derived from some other place and time."

During closing arguments, the prosecution commented on the cash in the photos, noting that it was a reasonable inference that the cash came from one of the bank robberies. Defense counsel argued that the amount of the cash, though substantial, was not consistent with the large stacks of bills taken from the banks during the robberies. Defense counsel insisted that the cash was more attributable to someone cashing their paycheck.

b. **Relevance of the Evidence**

i. *Standard of Review*

On appeal, we review the trial court's ruling on the admissibility of evidence for an abuse of discretion. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1057.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) " ' "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " ' " (*People v. Wallace*, *supra*, at p. 1058.) "[E]vidence leading only to speculative inferences is irrelevant." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035.)

ii. *Analysis*

We agree with defendant that the trial court abused its discretion when it refused to permit Charnele's testimony. The evidence that defendant sought to present logically,

13

naturally, and by reasonable inference tended to establish that the money shown in the photographs may have been obtained legitimately.

The trial court appears to have concluded that the evidence was irrelevant, because the testimony did not conclusively or directly establish that the money in the photographs was from defendant's cashed paychecks or from other savings.

As defendant notes, that is not the standard by which a trial court should determine relevancy. The " 'definition of relevant evidence is manifestly broad. Evidence is relevant when no matter how weak it tends to prove a disputed issue.' " (*People v. Tauber* (1996) 49 Cal.App.4th 518, 525.) Here, Charnele's testimony tended to prove that the photos of defendant and defendant's niece with large amounts of cash were *not* consistent with the timing of the robberies but were consistent with her penchant for cashing her paychecks and storing the money in the house. Certainly, there was nothing that actually tied the money in the photos to defendant's paychecks. The inference therefore may have been a weak one, but the relative weakness of the proffered evidence does not make it irrelevant. (*People v. Freeman* (1994) 8 Cal.4th 450, 491.)

Accordingly, we find that the court erred when it refused to allow defendant to present this testimony.

c. **Prejudice**

However, even though we find that the court erred in failing to admit Charnele's testimony, reversal is not warranted. In order to obtain reversal, defendant must establish that she suffered prejudice. We must affirm the judgment if it is "not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error . . . ." (*People v. Watson* (1956) 46 Cal.2d 818, 837.) Based on the relative weakness of the photo evidence that Charnele's testimony sought to discredit and the relative strength of the evidence against defendant, she has failed to demonstrate prejudice.

14

Defendant argues that omission of this evidence was prejudicial for several reasons. First, she opines that she presented a plausible case of misidentification, because the tellers only briefly saw the robbery suspect and some of the photo lineups were conducted in the same room as an officer who knew that defendant was the suspect. Additionally, defendant argues that her expert testimony suggested that in-court identifications are inherently suggestive, the suspect wore disguises during the robberies, and some of the eyewitnesses were not equivocal in their identifications. Furthermore, prominent items used in the robbery, such as the sunglasses, handbag, and wigs, were not found in her home.

The People counter that it is unlikely that Charnele's testimony would have impacted the verdict, because "[c]ommon sense dictates that generally, law-abiding people do not photograph the cash they have earned from their jobs, while some robbers like to show off their ill-gotten gains." Therefore, the People claim that the jury would not have inferred from Charnele's testimony that the cash may have been from a legitimate source. We disagree. Charnele's testimony offered an explanation for the cash depicted in the photographs. What weight to afford this inference was up for the jury to decide, and, in our view, the notion that some individuals may photograph the cash received from their legitimate paychecks does not seem completely absurd to the point where no juror would accept such an inference.

However, we find the People's second argument—that the error was not prejudicial given the ample evidence of defendant's guilt—has merit. Multiple eyewitnesses identified defendant as the suspect, or as someone who looked similar to the suspect. A search of defendant's home turned up evidence of clothing including the pink sweater and a pair of sneakers, which appeared consistent with clothing the suspect wore during some of the robberies. Detective Meeker also testified that the guns that

15

defendant held in the photos retrieved from her cell phone were consistent with the appearance of the guns used in one of the robberies.

Charnele's testimony tended to discredit the People's argument that the jury should infer that the cash shown in defendant's cell phone photo depicted money that was taken during the robberies. However, this evidence was already a relatively weak part of the People's case, because the People did not have any direct proof that the displayed cash came from the robberies. Defense counsel already highlighted the weakness of this evidence. During closing argument, defense counsel opined that the cash could have come from a legitimate source and that the amount displayed, though substantial, was not consistent with the large amounts of cash taken from the banks.

Accordingly, we find that defendant has not met her burden to show that it is reasonably probable that absent the error, she would have received a more favorable result under the standard set forth under *People v. Watson*, *supra*, 46 Cal.2d at page 837.

d. **Exclusion of Evidence as Deprivation of Constitutional Right to Present Defense**

Defendant also argues that the trial court's erroneous ruling effectively deprived her from preventing a defense. In essence, defendant claims that if the trial court erred in excluding Charnele's testimony, the error was of federal constitutional magnitude requiring reversal unless it can be shown, beyond a reasonable doubt, that the error did not affect the jury's verdict under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. We disagree.

"As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court

16

misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

The excluded evidence was on a minor and subsidiary point in defendant's defense theory of mistaken identity. Therefore, exclusion of the evidence did not deprive her of her defense. At trial, defendant was able to vigorously contest that she was the perpetrator of the robberies. Her defense expert contested the accuracy and reliability of the eyewitness identifications. She had witnesses that testified that the items that were consistent with clothing worn during the robberies did not belong to her. Further, during closing argument, defense counsel was able to argue to the jury that since "[defendant] worked," the cash shown in the pictures was not from the robberies. Defense counsel also argued that the cash displayed in another one of the photos was more consistent with "someone cashing a work check at a bank."

Accordingly, any purported error in the exclusion of Charnele's testimony did not rise to the level of federal constitutional error. We therefore analyze the prejudicial effect of its exclusion under the *Watson* standard of review, as opposed to the standard articulated in *Chapman*. And, for the reasons articulated above, we find that defendant fails to establish prejudice under *Watson*.

2. *Evidence of DNA Found on Bait Money*

a. **Background**

Before trial, defendant filed a motion in limine seeking to admit evidence of DNA that was found on bait money that was touched by the suspect in the February 8, 2014 robbery. According to defense counsel, the bait money was tested by the Santa Clara County District Attorney Crime Lab, which obtained a DNA mixture from the edges of the money. The DNA mixture contained the DNA of at least one male subject.

17

Defense counsel asserted in her moving papers that the laboratory report also indicated that defendant's DNA was excluded as a possible contributor to the DNA mixture.

During the hearing on the motions in limine, defense counsel explained that the bait money that was tested was obtained after the February 8, 2014 robbery. The robbery suspect took some of the bait money from a stack on the counter, but left the remainder of the money on the counter. The laboratory tested the bait money that was left on the counter.

The trial court questioned defense counsel on the DNA evidence, asking defense counsel if there were any physical descriptors attached to the DNA found on the bait money. Defense counsel answered that there were no physical descriptors, only that the DNA found was from a male subject. The trial court also asked defense counsel how many people had contact with the bait money. Defense counsel answered that this was also unclear.

Accordingly, the trial court tentatively denied defendant's request to admit the evidence. In so doing, the court noted: "On that evidence alone, that isn't sufficient. There could be 700 people who have touched that money, counsel. I mean, you are going to have to have more information. In other words, that that single DNA is significant, both in terms of when it was placed on the money and the fact that its placement there and the absence of any other is relevant here, if in fact there is an absence of any other. [¶] So at this point, based on the information you have provided, it's denied. But you have June 5, 9:00 to make changes in that."

At another hearing on June 3, 2014, defense counsel sought admission of third-party culpability evidence, including the DNA evidence. Defense counsel gave an offer of proof consistent with her previous description of the evidence. Namely, that the bait money was retrieved from the sixth robbery, that defendant's DNA was excluded, and that male DNA was found on the money. Defense counsel asserted that only a

18

portion (not the entire surface) of the bills were tested for DNA, and the portion tested was the portion that Kakoui, the teller at the sixth robbery, had indicated the robber had touched. The court asked defense counsel whether the DNA could have been deposited only when the suspect touched the money, and how long DNA can remain on money. Defense counsel asserted that she believed that based on Kakoui's observation of the robbery suspect's handling of the money, the DNA was likely to have been deposited during the crime. Defense counsel was not sure how long DNA evidence remains on money once deposited.

Thereafter, the court asked defense counsel, "Is there any actual evidence that the specific DNA to which you refer was deposited on that money at the time of the robbery?" Defense counsel then asked the court to reserve ruling on the matter until Kakoui was cross-examined. The court agreed.

During trial, defense counsel cross-examined Kakoui about the bait money that was handled by the suspect. Kakoui testified that she had taken the bait money out and had placed the stack on the counter after the suspect demanded money. Kakoui explained that after she put the bait money on the counter, she turned away, because the suspect demanded more money. When Kakoui turned back towards the suspect, the bait money was gone. Kakoui did not see what the suspect did with the bait money, but she presumed that the suspect had placed the bait money in her purse. Kakoui explained that she gave the suspect money from additional drawers, each time turning away from the suspect so she could get money from her drawers. Despite reserving a ruling on the matter, defense counsel did not seek a final ruling on the admissibility of the DNA evidence found on the bait money.

b. **Ineffective Assistance of Counsel**

Defendant argues that defense counsel rendered ineffective assistance when she failed to press the trial court for a final ruling on the admissibility of the DNA evidence.

19

She argues that defense counsel's failure to obtain a final ruling deprived her of the ability to challenge the ruling directly on appeal. (*People v. Holloway* (2004) 33 Cal.4th 96, 133 ["A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself."].) Before we address the merits of this claim, we briefly review the principles governing claims of ineffective assistance of counsel.

i.       *Overview of Ineffective Assistance of Counsel Claims*

To succeed on a claim of ineffective assistance of counsel, defendant must show both that counsel failed to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate and that defendant was prejudiced thereby. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217; *Strickland v. Washington* (1984) 466 U.S. 668, 684 [discussing federal constitutional rights]; *People v. Pope* (1979) 23 Cal.3d 412, 422 [discussing both state and federal constitutional rights].)

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citations.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]. 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.)

"In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel

20

on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver*, *supra*, 26 Cal.4th at p. 926.)

ii. *Deficiency of Counsel's Performance*

In claiming that her counsel was deficient, defendant argues that her request to admit the evidence was meritorious and there was no rational tactical reason for defense counsel's failure to press for a final ruling on the matter. We find that defendant fails to establish ineffective assistance of counsel.

Based on the record before us, there is a rational, tactical reason for defense counsel's conduct. Earlier, defense counsel had explained to the court that only a portion of the bait money, not the entire surface of the bills, was tested for DNA evidence. Defense counsel asserted that she believed the portion that was tested was the part of the bills that Kakoui had indicated the robbery suspect had touched, and further believed that based on Kakoui's observation of the suspect's touching of the money the DNA was likely deposited during the crime.

However, during cross-examination, Kakoui specifically testified that she did not see what the suspect did with the bait money after it was placed on the counter. Kakoui said she looked away from the suspect, and when she looked back the bait money was gone. Presumably, the suspect had placed the money in her purse. Based on Kakoui's testimony, defense counsel could have reasonably believed that admission of the DNA evidence was no longer worth pursuing, because only a portion of the bills was tested for DNA evidence and Kakoui's testimony would be unable to corroborate if the tested portion was indeed touched by the suspect during the robbery.

Additionally, the record before us does not include the full laboratory report. Therefore, it is also possible that defense counsel had other reasons for declining to pursue the DNA evidence. It is possible that the full report contained deficiencies that rendered it unbeneficial to the defense. It is also possible that defense counsel reviewed

21

the report after the trial court's tentative denial and determined, based on some tactical reason, that pursuing a final ruling would not be worthwhile based on the report's deficiencies.

Here, defense counsel never articulated a reason on the record for her failure to renew her request to admit the DNA evidence. We will reverse convictions on direct appeal " ' "on the ground of inadequate counsel only if the record affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' " (*People v. Lucas* (1995) 12 Cal.4th 415, 437.) Since the record does not affirmatively disclose that there can be no rational reason for defense counsel's conduct, we must reject defendant's claim of ineffective assistance of counsel.[5]

c. **Review on Appeal**

In a supplemental brief, defendant alternatively argues that she is able to pursue direct appellate review of the trial court's denial of her motion in limine seeking introduction of the DNA evidence. She argues that her trial counsel did not need to obtain a final ruling on the admission of the DNA evidence, because doing so would have been futile. (*People v. Welch* (1993) 5 Cal.4th 228, 237 ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile . . . ."].)

We do not find that the record adequately demonstrates that renewing the request would have been futile. The trial court tentatively denied the motion in limine, but it specifically told defense counsel that she had time to introduce more information and gave defense counsel a deadline to renew her request. Additionally, the trial court told defense counsel during the second hearing that it would reserve ruling on the matter.

_____

[5] In essence, defendant's claim of ineffective assistance of counsel rests on matters outside the appellate record, which is more appropriately raised in a habeas corpus proceeding. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

The trial court's actions do not indicate that it would have been futile for defendant to raise the issue again.

## DISPOSITION

The judgment is affirmed.

_____

Premo, J.

WE CONCUR:

_____

Rushing, P.J.

_____

Márquez, J.